# DECISIONS

OF THE

## SUPREME JUDICIAL COURT

OF

## MASSACHUSETTS

---

KAZIMIERZ MALINOSKI & another *vs.* D. S. MCGRATH, INC.

SAME *vs.* CITY OF NORTH ADAMS.

Berkshire.    September 20, 1932. — May 22, 1933.

Present: RUGG, C.J., CROSBY, WAIT, DONAHUE, & LUMMUS, JJ.

*Commissioner of Public Works. Statute,* Amendment, Revision. *Eminent Domain. Public Officer. Municipal Corporations,* Officers and agents. *Equity Pleading and Practice,* Appeal. *Equity Jurisdiction,* To enjoin continuing trespass, Laches. *Trespass.*

The commissioner of public works of North Adams, having by statute "cognizance, direction and control" of the construction and repair of streets and sidewalks, sewers and drains and waterworks, and the powers and duties of road commissioners of towns, had no authority under G. L. c. 84, § 10, after the subsidence in November, 1927, of a devastating flood of the north branch of the Hoosac River and in order to prevent further damage by floods, to take permanently a portion of the land of a riparian owner for the purpose of placing a wall a greater distance back from the bed of the river than the position occupied by a wall which the flood had destroyed, unless he made a taking by eminent domain in the manner prescribed by the provisions of G. L. c. 79.

The addition, when the General Laws were enacted, of the provision appearing in § 10 of c. 84 requiring that a taking under that section should be "by eminent domain" under c. 79, was an alteration of substance and not merely a verbal change in the revision of the statute not varying its meaning.

The building of the wall above described without the making by the commissioner of public works of a written or formal order of taking did not comply with the requirements of G. L. c. 79, §§ 1, 3, and was not a taking authorized by G. L. c. 84, § 10.

About two years after the building of the wall above described and several months after the filing of a suit in equity by the owner of the land, the city council of North Adams adopted and duly recorded an order purporting to make a taking of the land under the statutory requirements; but it appeared that the order failed to comply with the mandatory requirement of c. 79, § 1, that it should "state the interest . . . taken" in the land; and it was *held*, that such omission rendered the order invalid as a taking and that it did not affect the merits of the suit.

In the building of the wall above described, the commissioner of public works acted as a public officer and not as an agent of the city of North Adams; and therefore, it not appearing, in a suit in equity by the landowner against the city alleging a continuing trespass and seeking a removal of the wall, that the city through any authorized agents had assumed the custody and management of the wall or had performed any of the acts of which the plaintiff complained, it was *held*, that no ground for equitable relief against the city was made out, and a decree dismissing the bill was affirmed without prejudice to any right of the plaintiff to proceed at law.

If, upon the record before this court upon an appeal from a decree dismissing a bill in equity, it appears that the dismissal was proper although the grounds therefor stated by the trial judge were erroneous, the decree will be affirmed.

The actual building of the wall upon the plaintiff's land above described was performed by a contractor under a contract signed in behalf of the city by the commissioner of public works. The contractor acted in good faith. The landowner, although he must have known of the building from the beginning, gave the contractor no notice of his contention that the building of the wall was a trespass. The actual damage to the landowner, on the theory that his land was taken by eminent domain, was found to have been $100. The cost of removing the wall and filling and placing the land in the condition of devastation in which it was before the work was done would have been $1,000. On appeal, a decree dismissing a suit by the landowner against the contractor was affirmed without prejudice to any right of the plaintiff to proceed at law.

TWO BILLS IN EQUITY, filed in the Superior Court respectively on April 1 and on June 3, 1929, and described in the opinion.

In the Superior Court, the suits were referred to the same master, who heard them together. Material findings by the master are described in the opinion.

The suits were heard by *W. A. Burns,* J., who sustained certain exceptions by the defendants to the master's report;

ruled that the entry by the commissioner of public works of the city of North Adams was lawful under G. L. c. 84, § 10; that D. S. McGrath, Inc., acting under his authorization and by virtue of its contract, was not a trespasser; that the erection of the wall and the subsequent acts constituted an actual taking of a portion of the plaintiffs' real estate "not affected by or in accordance with a formal vote or order"; and that the plaintiffs had their remedy therefor under G. L. c. 79, § 10. He further found that the plaintiffs' real estate lying on the river side of the wall had been taken for the public use and ruled that the plaintiffs should have compensation therefor, but that the bill of complaint alleged in substance a continuing trespass and prayed for a mandatory injunction and that the plaintiffs were not entitled to such relief; and that the court could not award damages for the taking of land under the general prayers for relief. The bills therefore were ordered dismissed.

The plaintiffs appealed.

*W. J. Donovan*, for the plaintiffs.

*E. K. McPeck*, for the defendant D. S. McGrath, Inc., (*P. J. Ashe*, City Solicitor for the defendant city of North Adams, with him).

RUGG, C.J.    These two suits in equity are brought to secure the removal of a concrete wall and filling placed upon the land of the plaintiffs and for damages. One is against the city alleged to have ordered the work to be done, and the other against the contractor alleged to have performed the work. Each defendant averred in its answer that the constructions and work of which the plaintiffs complain were ordered by the commissioner of public works of the city, and that the land described in the plaintiffs' bill was taken by him in connection with the great flood of November, 1927, in accordance with law, because he was clothed with the powers of road commissioner of towns for the protection of streets. The answer of the defendant city amplifies the description of the great flood and avers that an emergency existed which required instant action to protect streets and public property and that such action was taken by the commissioner of public works.

It also sets up a subsequent formal taking by the city council of the land of the plaintiffs.

A master was appointed. His comprehensive findings of facts, the evidence not being reported, must be accepted as true. Those findings, so far as material to the grounds of this decision, are as follows: The plaintiffs, in November, 1927, owned a lot of land lying between Willow Dell, a public street in the city of North Adams, and the north branch of the Hoosac River, having a frontage of about forty-one feet on the easterly side of the street, a shore line of about fifty-three feet, and a depth of about seventy-five feet. They were also in possession under contract of purchase of an adjacent strip about twenty feet in width between street and river of which they have subsequently become owners. On November 3, 1927, very unusual flood conditions existed in the river, so that considerable property in that region was laid waste. The force of the waters tore out a stone retaining wall "higher than a man's head," which for years had stood as a barrier along the river bank, partly on the plaintiffs' land and apparently partly on the land of other riparian owners, swept away the plaintiffs' house and its foundations leaving not a vestige behind, uprooted trees on their land, stripped the soil to a depth of five or six feet, and deposited on their lot large rocks washed down from upstream. It did not appear when or by whom the stone retaining wall had been built. Twelve other buildings were swept away on the same side of Willow Dell, and on its opposite side the foundations of buildings were undermined. Willow Dell, which was about one fifth of a mile long, was washed so deeply as to expose to view gas, water and sewer pipes buried in it, and to bend and break some of them. Bridges were carried away and other streets badly washed and filled with wreckage. As soon as the flood subsided, at a conference of the male plaintiff with the mayor and city engineer of the city, the former refused to sign a paper giving consent to some public improvement on the devastated land owned by himself and his wife, and he stoutly objected to the project without his consent. The commissioner of public works of the city, after consul-

tation with members of the street and finance committees, advertised for bids for the construction of a "Willow Dell wall" so called. On November 15, 1927, agreement for performance of the work was signed by the contractor and in the name of the city by the commissioner of public works, and approved by the mayor. There was no evidence that this contract was first authorized, or was subsequently expressly ratified, by vote of the city council, or that "an anticipatory appropriation of money was made" to pay the cost of the work to be done under the contract. The master drew the inference that payments due under the contract were made out of the city treasury. The commissioner of public works has "cognizance, direction and control" of the construction and repair of streets and sidewalks, sewers and drains and waterworks, and except as otherwise provided has the powers and duties of road commissioners of towns. St. 1895, c. 148, § 37, as latest amended by Spec. St. 1918, c. 103, § 15. His object in executing this contract was to protect Willow Dell and the private property on each side of it from future encroachments by the river, but he never purported to take by eminent domain any part of, or any right in, the land of the plaintiffs under G. L. c. 79. Pursuant to the contract a solid concrete wall was built between Willow Dell and the river, about a fifth of a mile in length, from Miner to Union streets. When, to carry out the plan, entry was made upon the plaintiffs' land, it was in the condition in which the flood had left it. The commissioner of public works decided where the wall should be placed and he or his appointee gave the contractor lines to follow in construction. This wall is nine feet high above its foundation, which is seven or eight feet wide and four feet deep, and tapers to a width of sixteen to eighteen inches at the top. On the plaintiffs' land it was not placed on the line of the old wall but was set farther back from the river for some distance, to that extent reducing the depth of their lot between street and wall. A new area of about eighteen hundred square feet of the plaintiffs' land thus was thrown on the river side of the wall and rendered practically useless. Large rocks were placed against the wall

on both sides. The land of the plaintiffs was filled to a uniform grade from the top of the wall to the street line. The effect .of the widening of the channel of the river was to reduce the elevation to which it might rise in times of high water and to lessen the strain to which the wall would be put by the pressure or the impact of a great volume of rushing water. From an engineering standpoint, the location of the new wall is better than that of the old. Willow Dell is somewhat crescent in shape, with the convex side toward the west, but the new wall, instead of following a curved line, consists of straight sections of concrete, with an occasional change of direction between one section and the next. The vertex of one of the obtuse angles thus formed is on the plaintiffs' land. The plaintiffs did not know of the making of the contract, and their land was entered upon and used without their express consent; but they knew about the work, took no steps to prevent it, and did not remonstrate with the contractor or any person representing him, but expected compensation and demanded a price grossly excessive according to the findings.

There was no public emergency imperatively requiring entry upon the land of the plaintiffs for the construction of the wall. That founded on the flood had passed and there was no similar exigency present or impending at the times of the acts here in issue, except as floods due to excessive snow or rain might constitute a danger.

It is apparent from the entire record that the parties defendant and the commissioner of public works acted in good faith and for the promotion of the public welfare so far as that may be a factor, notwithstanding the contention of the plaintiffs that entry upon their land was not warranted.

The commissioner of public works, possessing the powers of road commissioners of towns, was authorized to "enter upon, use or survey or take by eminent domain under chapter seventy-nine any land" which he deemed "necessary for the purpose of securing or protecting a public way." G. L. (Ter. Ed.) c. 84, § 10. The context indicates plainly that the words "enter upon," "use" and "survey" in this section import a temporary and comparatively brief period

of occupation of privately owned land. While the word "use" may signify an occupation longer than that needed for an entry upon or a survey, it falls short of describing a permanent possession. The only part of the statutory power sufficiently broad to cover what has been done upon the land of the plaintiffs is that authorizing a taking "by eminent domain" under c. 79. The authority to "take any land" in that connection was conferred first by St. 1868, c. 264. See Pub. Sts. c. 52, § 14; R. L. c. 51, § 14; St. 1917, c. 344, Part 4, § 20. Those statutes contained no direction as to the way in which such taking should be made. To what extent under those enactments a taking could have been accomplished by acts *in pais* need not be determined (*Bryant* v. *Pittsfield*, 199 Mass. 530; compare *Mayo* v. *Springfield*, 136 Mass. 10), because, when the General Laws were enacted, there were inserted in the section as theretofore framed, after the word "take" the further words "by eminent domain under chapter seventy-nine." This addition was something more than a verbal change in the revision of a statute, not varying its meaning. It was an alteration of substance. *Boston & Maine Railroad* v. *Billerica*, 262 Mass. 439, 449. It was a limitation and a specification. It prescribes the only way in which the taking of land now can legally be made. The statute, c. 84, § 10, in its present form discloses a plain purpose to require that the taking be made according to the procedure and with the formalities prescribed by c. 79. The contention is not tenable that c. 84, § 10, authorizes a taking by road commissioners by acts *in pais* on the ground that by c. 79, § 10, damages are recoverable for takings made in that way. The form and procedure for taking are prescribed by c. 84, § 10, by reference to c. 79, while c. 79, § 10, provides in general terms for damages, not only for those caused by takings in accordance with its provisions but also for those caused by takings made in other ways. The contention is also untenable that G. L. c. 79, § 45, authorizes as a part of its procedure any taking except by a formal order.

This conclusion is emphasized by the circumstance that takings of certain rights in private land for public uses by

acts *in pais* are in certain instances authorized by other statutory provisions without such limitation and specification as are prescribed by c. 79. See, for example, G. L. (Ter. Ed.) c. 41, § 79; c. 48, § 3; c. 82, § 25; c. 162, § 17. It may be that such authority is conferred by other private or public laws. Decisions rendered before the enactment of G. L. c. 79, as to informal takings by eminent domain, are no longer applicable save in the restricted instances still expressly authorized.

It follows that, in order to determine whether a taking was made in the case at bar, resort must be had to c. 79. The purpose of the commissioners to consolidate and arrange the General Laws (by whom this chapter was framed and reported) was to devise "a simple and coherent system of eminent domain procedure . . . the same . . . so far as possible for the taking of land for all purposes." The adoption of c. 79 was in furtherance of a general design to the end that "everybody concerned will know how to take land by eminent domain and how to ascertain whether land or any interest therein has been seized" under eminent domain. It promotes the general scheme of the law that the state of titles of real estate ought to be disclosed on public records rather than by acts *in pais*. *Watertown* v. *Dana,* 255 Mass. 67, 71. Takings under c. 79 must by §§ 1 and 3 be by a formal order of taking containing (1) a description of the land or interest in land seized sufficiently accurate for identification, (2) a statement of the interest taken, and (3) the purpose for which the property is taken, with certain other matters; and copy of such order must be recorded in the appropriate registry of deeds.

The commissioner of public works of the city did not follow this procedure. He made no written or formal order of taking. The result is that, so far as he is concerned, there was no taking of land of the plaintiffs before or in connection with the construction of the concrete wall. *Radway* v. *Selectmen of Dennis,* 266 Mass. 329. *Walker* v. *Medford,* 272 Mass. 161.

It becomes unnecessary to consider whether any appropriation was made by the city for this construction as

required by law before the contract was signed, G. L. (Ter. Ed.) c. 40, § 14, *Breckwood Real Estate Co.* v. *Springfield,* 258 Mass. 111, or whether a taking of the magnitude here shown falls within the scope of c. 84, § 10, or, if the plaintiffs had brought a petition for the assessment of damages on the assumption that there had been a taking, what defences would have been open to the city.

The defendant city pleaded in its answer that subsequently to the filing of the plaintiffs' suit it had made a taking of the land in question by eminent domain. Respecting this averment, the finding is that by order of the city council adopted on November 5, 1929, and duly recorded, the city undertook to make a taking of the land of the plaintiffs covered by the wall and lying between it and the river. It has been found that this purported taking did not include the whole of the foundation of the wall. See *Szathmary* v. *Boston & Albany Railroad,* 214 Mass. 42. This taking, however, is fatally defective in that the order adopted by the city council failed to comply with the mandatory requirement of c. 79, § 1, to "state the interest . . . taken" in the land. It does not state whether the taking was in fee, or of an easement, or, if of an easement, its nature and extent. This omission rendered the order invalid. That point is expressly adjudicated in *Walker* v. *Medford,* 272 Mass. 161, and need not be here elaborated.

The commissioner of public works was a public officer. His position and duties were created and imposed by statute. In the performance of those duties he was not the agent of the city but a public officer for whose acts the city was not responsible. *McCann* v. *Waltham,* 163 Mass. 344. *Smith* v. *Gloucester,* 201 Mass. 329. *Dupuis* v. *Fall River,* 223 Mass. 73. *Wood* v. *Concord,* 268 Mass. 185, 190. *Anglim* v. *Brockton,* 278 Mass. 90, 96. Even an appropriation by the city for the work would not affect this principle. *McManus* v. *Weston,* 164 Mass. 263, 267. *Reed* v. *Springfield,* 258 Mass. 115. Plainly, the commissioner of public works upon the findings was acting in his capacity as a public officer in the performance of the work in question, and not as agent of the city.

There is nothing in the record to show that the city through any authorized agents has assumed the custody and management of the wall, or has performed any of the acts of which the plaintiffs complain. Therefore the plaintiffs fail to make out any ground for equitable relief against the city.

· The case at bar is distinguishable from *Miles* v. *Worcester*, 154 Mass. 511, where there was no question that a wall belonging to the defendant city and originally located upon its land had bulged upon land of the plaintiff. There was ample proof of ownership by that defendant of the offending wall. It is also distinguishable from *Tyler* v. *Haverhill*, 272 Mass. 313, where the defendant confessedly had constructed a wall under a claim of title upon land which was found to belong to the plaintiff.

In the view taken of the principles of law applicable to findings of fact, it becomes unnecessary to consider the action of the trial judge in sustaining certain objections to the master's report. They are immaterial to the grounds of this decision. Although the reasons given by the trial judge for dismissing the bill against the city cannot be supported, his action was right. *Reilly* v. *Selectmen of Blackstone*, 266 Mass. 503, 512.

It becomes unnecessary to consider whether, if the plaintiffs had showed themselves entitled to equitable relief, entry of decree ought to be suspended in order to enable the city to make a valid taking of their land, or necessary easements therein. See *Story* v. *New York Elevated Railroad*, 90 N. Y. 122, 179. *Doty* v. *Johnson*, 84 Vt. 15, 23.

There is nothing in the record to show that the contractor did not act in entire good faith in all that it did. The plaintiffs gave it no notice of their contention that it was a trespasser in building the wall, although they must have known about it from the very beginning. Every presumption is in favor of the good faith of the contractor in the absence of proof to the contrary. The master has found that the actual damages sustained by the plaintiffs, on the theory that their land has been taken by eminent domain, is $100.

This sum includes the value of the land lying between the wall and the river rendered practically useless. He also found that to remove the wall and filling and place their land in the condition it was in before any work was done will cost $1,000. There is no finding that to make such removal would be a reasonable use of their land. On the contrary, by every inference from other facts it would be a highly unreasonable use of the land. Equity will refuse to grant injunctive relief where the expense to the defendant who has acted in good faith would be out of all proportion to the benefit to be gained by the plaintiff. *Lynch* v. *Union Institution for Savings,* 159 Mass. 306, 308. *Methodist Episcopal Society in Charlton City* v. *Akers,* 167 Mass. 560, 564. *Loughlin* v. *Wright Machine Co.* 273 Mass. 310, 316, and cases collected. *Smith* v. *New England Aircraft Co. Inc.* 270 Mass. 511, 531. This is especially applicable where the plaintiffs, knowing all about the work from the very beginning, gave the contractor no notice but permitted it to go forward with work which in some aspects was of obvious, practical advantage to them. Compare *Loud* v. *Pendergast,* 206 Mass. 122, 124.

There is no finding as to the actual damage sustained by the plaintiffs by the trespasses on their land. The case has not been presented on that theory. The master states that no evidence of market values was introduced and no estimate on that basis was made. *Sturtevant* v. *Ford,* 280 Mass. 303, 317–318. The plaintiffs must stand on the case presented by their pleadings and evidence, and upon the findings made on the issues raised. Their rights in an action at law are not before us. *Newburyport Institution for Savings* v. *Puffer,* 201 Mass. 41, 48–49. In this case, also, the plaintiffs fail to show error in the decree dismissing the bill.

Every question argued by the plaintiffs has been considered. In each case the plaintiffs fail to show that they are entitled to equitable relief, and hence the decree in each case is affirmed without prejudice to any rights they have to proceed at law.

*Ordered accordingly.*